UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GABRIELA ARTEAGA, individually, and as mother and next friend of I.G. a minor, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA )<br>)<br>Defendants. ) | <br><br><br><br><br><br>No. 10 C 7767<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gabriela Arteaga, both individually and as the mother of I.G., a minor, brings a claim under the Federal Tort Claims Act ("FTCA") alleging medical malpractice in the prenatal care and delivery of I.G. Defendant United States has filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), arguing the action is barred by the two-year statute of limitations for FTCA claims. For the reasons discussed here, the motion is granted.

## FACTUAL BACKGROUND

Plaintiff Gabriela Arteaga ("Plaintiff" or "Arteaga") is the natural mother of I.G. (Am. Compl. ¶ 1.) From December 1, 2003, through July 2, 2004, Arteaga was pregnant with I.G. and received prenatal care from Erie Family Medical Center ("Erie") and its nurse-midwife agents. (Pl.'s Resp. to Def.'s Mot. to Dismiss (hereinafter "Pl.'s Resp."), at 1.) Erie is a private health center that receives federal grant money from the Public Health Service. (Notice of Removal, Ex. F to Pl.'s Resp. at 3.)

When Erie medical staff examined Arteaga on June 21, 2004, they learned that she was experiencing "extreme weight gain" and had a high fundal height, and that the estimated weight of her fetus was also high. (Pl.'s Resp. at 1.) These findings are often indicators of macrosomia, also known as excessive birth weight or "big baby syndrome." (*Id.*) According to Arteaga, these findings should have led Erie staff to conclude that: (1) I.G. was at a high risk for macrosomia; (2) I.G. was

too large to be delivered vaginally without serious injury; and (3) Arteaga required referral to an obstetrician-gynecologist ("OB-GYN") for consultation on a caesarean delivery of I.G. (Am. Compl. ¶ 7.) Erie did not in fact advise Arteaga at any time during her pregnancy that, because of I.G.'s size, she should consider a caesarean section or an alternative birthing option. (Arteaga Aff. ¶¶ 6-8, Ex. B to Pl.'s Resp.)

On July 2, 2004, Arteaga delivered I.G. vaginally, receiving care and treatment from Erie and its nurse-midwife agents at Northwestern Memorial Hospital. (Am. Compl. ¶¶ 4-6.) I.G. weighed eleven pounds at birth and was delivered at almost forty-two weeks gestational age. (Pl.'s Resp. at 1-2.) On July 9, 2004, one week after her birth, I.G. was diagnosed with a right brachial plexus injury as a result of shoulder dystocia. (*Id.* at 2.) Shoulder dystocia is "caused by impaction of the fetal shoulder above the pubic symphysis after delivery of the head." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 582 (32d ed. 2012). Essentially, this condition arises when an infant's shoulder becomes lodged in the birth canal. A right brachial plexus injury results from damage to the group of nerves running from the spinal cord to the shoulder and often causes local paralysis. Roscoe N. Gray & Louise J. Gordy, ATTORNEY'S TEXTBOOK OF MEDICINE ¶ 100.51 (3d ed. 2011). In I.G.'s case, the injury limits the use of her right arm and prevents her from straightening her right elbow. (2/11/2005 Evaluation/Assessment Report, Ex. 4 to Mem. in Supp. of Def.'s Mot. to Dismiss (hereinafter "Def.'s Mot.")[17], at 1.)

On February 11, 2005, seven months after I.G.'s birth, a social worker from the Bureau of Early Intervention at the Illinois Department of Human Services visited Arteaga's home to evaluate I.G.'s development. (2/11/2005 Evaluation/Assessment Report, Ex. 4 to Def.'s Mot. at 1.) According to the social worker's notes, Arteaga stated during the evaluation that she "had one ultrasound when she was five months pregnant with normal results," and she "was upset that she was not allowed additional ultrasounds to check the baby's progress." (*Id.*) Arteaga felt that additional ultrasounds would have shown that vaginal delivery was too risky and stated that she

was depressed about I.G.'s condition because she believed it was preventable. (*Id.*) The evaluation report further explains that I.G.'s father was also upset about I.G.'s condition because he too believed it could have been prevented with more attentive prenatal care. (*Id.* at 2.)

In a second evaluation on July 27, 2005, Arteaga and I.G.'s father reiterated their belief that I.G.'s condition could have been prevented, had medical staff performed additional ultrasounds during Arteaga's pregnancy. (7/27/2005 Evaluation/Assessment Report, Ex. 5 to Def.'s Mot. at 1-2.) This second evaluation also revealed that Arteaga and I.G.'s father had asked an attorney to evaluate I.G.'s medical records to determine whether any legal action could be taken against the hospital. (*Id.* at 2.) Arteaga told the social worker that, six months after receiving the medical records, the attorney determined that no legal action could be taken. According to the social worker's note, Arteaga said the lawyer believed the medical staff did all they could to protect I.G. during delivery. (*Id.*) The social worker's notes also state that Arteaga's therapist gave her the phone number for the Chicago Bar Association lawyer referral service in the event she wanted another attorney to review I.G.'s medical files and provide a second opinion. (*Id.*)

If Arteaga sought any other legal or medical opinion before December 2009, those efforts are not documented in the pleadings. Arteaga states that it was not until December 2009 that a healthcare provider informed her of the cause of I.G.'s injuries or of Erie's possible negligence. (Arteaga Aff. ¶ 11.) At that time, Arteaga's current counsel consulted with a certified nurse-midwife[1] (Ports Aff., Ex. 1 to Compl. at 1), who reviewed I.G.'s medical records from Northwestern Memorial Hospital and Erie Family Health Center. (1/18/10 Letter to Ports, Ex. 2 to Compl. at 1.) In the nurse-midwife's opinion: (1) Arteaga's "significant prenatal weight gain, body mass index and fundal height" should have indicated to Erie staff that I.G. was macrosomic; (2) Arteaga should have been

---

[1] Arteaga's attorney has yet to determine whether this nurse-midwife would be called as a witness at trial, and has thus declined to reveal his or her identity. (Ports Aff., Ex. C to Pl.'s Resp. at 5.)

referred to an OB-GYN for a caesarean section; and (3) Erie's failure to "properly monitor and assess the baby's size" and to recommend a caesarean section was "negligent and proximately caused [I.G.] to suffer a brachial plexus injury." (*Id.*) Accordingly, the nurse-midwife concluded that Arteaga had a meritorious medical malpractice case against Erie. (*Id.*)

Arteaga subsequently filed a complaint against Erie and its agents—Linda Sosman, CNM, and Heidi Vyhmeister, CNM—on March 10, 2010, in the Circuit Court of Cook County, alleging negligence in the prenatal care and delivery of I.G. (Compl. ¶ 10.) In April 2010, Arteaga's attorney learned that the United States was considering removing the action to federal court. (Ports Aff., Ex. D to Pl.'s Resp.) Until then, neither Arteaga nor her attorneys knew that Erie was a federal agency. (*Id.*; Arteaga Aff. ¶ 13.) The case was removed to federal court on August 18, 2010, and the United States was substituted as a defendant for Erie, Sosman, and Vyhmeister pursuant to 42 U.S.C. § 233 and 28 U.S.C. § 2679(d)(1). (Def.'s Mot. at 2.) The case was dismissed without prejudice on September 16, 2010, for failure to exhaust administrative remedies, (Pl.'s Resp. at 3), which is a prerequisite to filing suit under the FTCA. 28 U.S.C. § 2675(a).

Accordingly, Arteaga filed her administrative claim with the Department of Health and Human Services ("HHS") on May 11, 2010. (5/13/2010 Letter from Dept. of Health and Human Services, Ex. 1 to Def.'s Mot. at 1.) After six months had passed without an administrative decision, Arteaga filed this case on December 1, 2010, again naming Erie, Sosman, and Vyhmeister as individual defendants. (Def.'s Mot. at 2.) The United States was substituted as the sole defendant in an amended complaint filed on January 24, 2011, and Arteaga's administrative claim was denied on February 7, 2011. (*Id.*) The United States then filed this motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) on March 30, 2011, arguing that the claim is time-barred by the two-year statute of limitations in the FTCA. (*Id.* at 1.)

**DISCUSSION**

Under the FTCA, plaintiffs seeking money damages from the United States for injury caused by the negligent act or omission of a federal employee must first file a claim with the appropriate federal agency before filing an action in district court. 28 U.S.C. § 2675(a). A tort claim against the United States is forever barred if the plaintiff does not file it with the appropriate federal agency within two years "after such claim accrues." 28 U.S.C. § 2401(b). Although "FTCA claims are governed by the substantive law of the state where the alleged tort occurred," *Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003) (citing 28 U.S.C. § 1346(b)(1)), "[f]ederal law governs when a claim accrues under the FTCA." *Arroyo v. United States*, 656 F.3d 663, 668 (7th Cir. 2011).

Courts must dismiss a case as untimely pursuant to Rule 12(b) when the complaint "plainly reveals that the action was not brought within the statutory period." *U.S. ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 898 (N.D. Ill. 2009) (citing *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)). In other words, if Arteaga's claim accrued more than two years prior to May 11, 2010, when Arteaga filed her administrative claim with HHS, this action is barred under the FTCA. For the reasons explained herein, this court finds that Plaintiff's claim accrued, at the latest, by July 2005, more than two years prior to the filing of her administrative claim. Thus, the suit is barred and the government's motion to dismiss must be granted.

**I. Plaintiff's claim accrued, at the latest, by July 2005 when she possessed the critical facts that formed the basis of her complaint**

Arteaga argues that her FTCA claim did not accrue until December 2009 because before that point, she did not know and could not be expected to have known that Erie's medical treatment caused I.G.'s condition. Claims for medical malpractice under the FTCA "accrue when a plaintiff has discovered his injury and its probable cause even though he may be ignorant of his legal rights." *Massey v. United States*, 312 F.3d 272, 276 (7th. Cir. 2002). Accrual of a claim does not "await awareness by the plaintiff that his injury was negligently inflicted." *United States v. Kubrick*,

5

444 U.S. 111, 123 (1979). Instead, the clock starts when a plaintiff is "in possession of the critical facts that he has been hurt and who inflicted the injury." *Id.* at 122. At that point, "the potential malpractice plaintiff has reason to believe that he may have a legal claim, and he then has the statutory period in which to conduct the necessary investigation and prepare and file a suit." *Goodhand v. United States*, 40 F.3d 209, 212 (7th Cir. 1994).

In *Kubrick*, the plaintiff veteran received an antibiotic as treatment for a leg infection at a federal facility in April 1968. 444 U.S. at 113. He suffered hearing loss shortly thereafter. *Id.* at 114. In January 1969, a specialist informed the plaintiff that it was "highly possible that the hearing loss was the result of the [antibiotic] treatment administered at the hospital." *Id.* at 114. Nearly two years later, in June of 1971, a different specialist definitively told the plaintiff that the antibiotic "caused his injury and should not have been administered." *Id.* The lower court found that the latter statement triggered the statute of limitations, reasoning that a claim should not accrue until the plaintiff "knows or should suspect that the doctor who caused his injury was legally blameworthy." *Id.* at 121. The Supreme Court reversed, holding that Kubrick's FTCA claim accrued in January 1969—when he was "in possession of the critical facts that he has been hurt and who inflicted the injury"—not when he later learned his specific legal rights. *Id.* at 120-22.

Similarly, in *Massey*, the Seventh Circuit affirmed a district court finding that a prisoner's claim of injury resulting from a negligent delay in a hernia operation accrued, at the latest, when he was aware of both his injury (increased pain in his abdominal area) and the probable cause of that injury (the prison's delay in surgery). 312 F.3d at 276-277. The court rejected the plaintiff's argument that the statute of limitations began to run only when he realized the delay in surgery amounted to negligence. *Id.* at 277. Rather, the court found that Massey's claim accrued by the time his attorney had written a second letter to the warden, insisting that the prison's medical inattention to Massey's condition was causing him serious physical discomfort and was jeopardizing

6

his life. *Id.* at 274, 279. By then, Massey was well aware of both the existence and cause of his injury.

Arteaga's claim in this case likely accrued by February 2005, but had certainly accrued by July 2005. I.G.'s pediatrician diagnosed her with a right brachial plexus injury on July 9, 2004, a week after her birth, (Medical History and Physical Form, Ex. 2 to Def.'s Mot. at 2.) Then, on February 11, 2005, Arteaga explained to a social worker that she was "upset that she was not allowed additional ultrasounds to check the baby's progress," that "she feels that additional ultrasounds would have shown that the baby was too big for a vaginal delivery," and that she "believes that [I.G.'s condition] was preventable." (2/11/2005 Evaluation/Assessment Report at 1-2.) Applying the framework articulated in *Kubrick*, sometime between July 9, 2004 and February 11, 2005, Arteaga both learned of I.G.'s right brachial plexus injury and came to suspect negligent prenatal care and vaginal delivery as the probable causes. Her statements to the social worker demonstrate that she knew "the critical facts" relevant to any claim I.G. may have had under the FTCA. At the latest, Arteaga's claim accrued by July 2005 when she stated that she had provided an attorney with I.G.'s medical records in order to ascertain whether I.G. had a viable legal claim. Therefore, by July 2005, Arteaga knew of the existence and probable cause of I.G.'s injury and thus, any claim under the FTCA had accrued.

Arteaga contends that the statute of limitations should be tolled by the discovery rule because she "could not reasonably be expected to discover the existence of a causal link between I.G.'s medical treatment and her injury prior to December 9, 2009," when she claims she first learned that Erie may have caused I.G.'s injury. (Pl.'s Resp. at 4-7.) The cases Arteaga cites, however, actually reinforce the *Kubrick* standard and establish that her claim accrued by July 2005 when she knew of her daughter's injury, suspected Erie's medical treatment as the probable cause, and possessed medical records that reinforced her suspicion.

Thus, in *Nemmers v. United States*, 795 F.2d 628 (7th Cir. 1986), the plaintiffs' child was born in 1973, and within eighteen months they knew that he suffered from cerebral palsy. They did not file suit, however, until eight years after their son was born. 795 F.2d at 629. In 1977, a physician informed the Nemmers that delivery trauma "might have contributed somewhat" to their son's condition, but that the likeliest cause was the severe influenza the mother suffered in her third trimester. 795 F.2d at 629-630. The district court concluded that the statute of limitations did not begin to run until four years later, in 1981, when the plaintiffs read a newspaper article about a child with a similar condition caused by a negligent delivery. *Id.* at 630. The government appealed from a judgment for plaintiffs and the Seventh Circuit remanded, directing the trial court to determine whether a reasonable person should have known that there was a "significant chance that medical decisions near the time of birth played a causal role" in the boy's injury based on: (1) the 1977 letter; (2) Mrs. Nemmers' personal knowledge that she suffered merely a cold, not influenza; and (3) the fact that Mrs. Nemmers endured more than two days of intermittent labor before the hospital would attend to her. *Id.* at 633. In this case, Arteaga expressed concerns that "medical decisions near the time of [I.G.'s] birth played a causal role" in I.G.'s injury as early as February 2005, when she first spoke with the social worker, suggesting her FTCA claim had already accrued by then.

Arteaga also cites *Mally v. United States*, No. 90 C 239, 1990 WL 186099 at *5 (N.D. Ill. 1990), where the court concluded that the plaintiff's FTCA claim did not accrue until five months after her husband's death, when she first reviewed his medical records. Those records were "the first bit of objective evidence that the [defendant] may have been responsible for her husband's death." The government argued that the claim accrued at the time of her husband's death, at the latest, because the plaintiff observed first-hand suspicious incidents during her husband's treatment. *Id.* at *2. The court disagreed. The plaintiff's husband had been admitted with chronic heart troubles and medical staff told her he died from heart disease, so plaintiff had no objective basis for believing the hospital was negligent. *Id.* at *5. The plaintiff "could not have objectively

8

connected [the government's] actions with her husband's death" until she reviewed the medical records; once she did, the statute of limitations began to run. *Id.* Here, by contrast, Arteaga's own statements to the social worker demonstrate that she "objectively connected" Erie's medical treatment and I.G.'s injury by February 2005 and possessed the medical records to substantiate that connection by July 2005.

Finally, Arteaga cites *Thompson v. United States*, where the court held that the plaintiff's FTCA claim accrued when he first received the autopsy report of his wife's death, which served as the "factual basis for filing suit." 642 F. Supp. 762, 767 (N.D. Ill. 1986). Doctors at an army medical center told the plaintiff that his wife died of lupus, an incurable disease. *Id.* at 762. In the following months, the plaintiff researched the disease and became suspicious concerning his wife's medical treatment. *Id.* Even though he initially retained an attorney in December 1983 to look into the matter more carefully, the court found his claim did not accrue until August 1984 when he first received his wife's autopsy report. *Id.* at 767. Until then, the court concluded, plaintiff could not "reasonably have known of a causal link between [the defendant's] acts or omissions and [his wife's] death." *Id.* The court distinguished Thompson's case–"where the plausible explanation is one of purely natural causes"—from those cases where the injury "is unquestionably the result of some human conduct." *Id.* In the latter cases, the injury alone provides a reasonable basis for believing that the medical care was improper or inadequate, even where the plaintiff has received no formal medical report. *Id.* at 767-68.

In this case, I.G.'s injury appears to be the type that is "unquestionably the result of some human conduct." During delivery, I.G.'s shoulder became lodged in the birth canal, resulting in the brachial plexus injury. *Thompson* thus suggests that the injury itself provided Arteaga with a reasonable basis for believing Erie's medical care was inadequate, thereby starting the clock on the statute of limitations, regardless of whether any negligence on the part of Erie staff was the proximate cause of I.G.'s injury. Even if the injury itself did not put Arteaga on notice, certainly by

9

the time she asked an attorney to review I.G.'s medical records in the first half of 2005, she was aware of a possible causal link between the injury and Erie's conduct. Moreover, there is no indication in the record that the December 2009 medical opinion alleging Erie's negligence in I.G.'s care was based on any additional medical reports not possessed by Arteaga in 2005.

Plaintiff now suggests that the frustrations she expressed to the Illinois social worker on February 11, 2005 and July 27, 2005, were mere "subjective beliefs" that are insufficient to trigger the statute of limitations. (Pl.'s Resp. at 7-8.) Arteaga contends that, because she was "never informed of the medical cause of I.G.'s injuries" or "that Erie was medically negligent," the statute of limitations should be tolled until she did learn as much in December 2009. (Pl.'s Resp. at 7-8.) But "the statute starts to run when *a reasonable person* would know enough to prompt deeper inquiry into a potential cause [of the injury]." *Nemmers*, 795 F.2d at 632 (emphasis added). The standard is an objective one, not, as Arteaga would prefer, a subjective one. The statute of limitations under the FTCA begins to run "either when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause." *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985). Indeed, Arteaga behaved exactly as a reasonable person would when, within a year of I.G.'s birth, she obtained the relevant medical records and sought legal advice on any potential claims. The government should not now bear the burden of Arteaga's decision to take no further action for another four years.

Arteaga urges that case law supports the notion that her subjective beliefs are relevant to the statute of limitations, but the court is unpersuaded. First, she cites *Gould v. United States*, 684 F. Supp. 508 (N.D. Ill. 1988), where the court held that the plaintiff's FTCA claim accrued when she first acquired medical knowledge regarding the potential cause of her son's injury. 684 F. Supp. at 514. In that case, the plaintiff's son had been diagnosed with hyperactive, behavioral, and neurological problems shortly after birth. *Id.* at 510. Numerous physicians evaluated the boy

between 1974 to 1984, and not one could even speculate about, much less determine, the cause of the boy's problems. *Id.* at 510-11. The plaintiff only learned that negligent prenatal care and delivery were a "possible cause" of her son's injury in December 1984 when, for the first time, a clinical psychologist suggested as much in an evaluation. *Id.* at 511. Only then, the court found, did the FTCA claim accrue because prior to the psychologist's evaluation, the plaintiff did not have "*any knowledge*" that the government's negligence may have caused their son's injury. *Id.* at 514 (emphasis added).

Similarly, in *Stoleson v. United States*, 629 F.2d 1265 (7th Cir. 1980) the court held that the time for filing plaintiff's FTCA claim was tolled until a doctor finally confirmed suspicions she had held for years that nitroglycerin exposure at her government job caused her heart problems. 629 F.2d at 1270-71. The doctor who ultimately informed Stoleson of the link between her regular nitroglycerin exposure and her condition published, literally, the first article on the subject, which included a case study on Stoleson herself. *Id.* at 1267. The tolling was uniquely justified, therefore, because "medical science did not then recognize the causal connection" between nitroglycerin exposure and heart problems. *Id.* at 1270. Like the plaintiff in *Gould*, Stoleson lacked *any knowledge* that the government may have been responsible for her condition prior to her diagnosis in the article.

This case is quite different. The medical conditions relevant to Arteaga's claim—macrosomia and shoulder dystocia resulting in a brachial plexus injury—are common and widely understood. Plaintiff's failure to secure a medical opinion and file a claim within two years of the injury does not place her in the same position as the plaintiffs in *Gould* and *Stoleson*; Arteaga was not waiting for medical science to catch up with her claim. While she did not seek medical counsel, she did ask an attorney to evaluate her claim. (7/27/2005 Evaluation/Assessment Report at 2.) Regardless of its merits, the attorney's determination that Arteaga had no claim for relief does not toll the statute of limitations. *See, e.g.*, *Kubrick*, 444 U.S. at 124 (stating that accrual is

11

not postponed merely because the plaintiff "is incompetently or mistakenly told that he does not have a case"). Indeed, Arteaga's efforts to investigate a legal claim, by themselves, indicate she possessed "the critical facts" and her claim had accrued.

As Arteaga sees things, her claim did not accrue until 2009 when a nurse-midwife examining I.G.'s medical records—apparently the same records examined by an attorney in 2005— validated Arteaga's "subjective beliefs." (Pl.'s Resp. at 7.) Yet Arteaga offers no explanation as to why she did not obtain this medical opinion, or any sort of second opinion, in 2005. Quite unlike the plaintiffs in *Gould* and *Stoleson*, who doggedly sought one medical opinion after another, Arteaga appears to have dropped pursuit of her legal claim for a four-year period. Had Arteaga solicited a medical opinion in 2005, she may well have had a viable claim for malpractice against Erie. The court sympathizes with I.G.'s suffering, but cannot assign the burden of Arteaga's unexplained delay to the government.[2]

## II. Plaintiff need not know that Erie is a federal facility for her claim to accrue

---

[2] In her response to Defendant's motion to dismiss, Arteaga also directs the court to persuasive authority from other circuits where FTCA statutes of limitations were tolled or could have been tolled for various reasons. These cases, however, do not undermine the principal holding of *Kubrick* that a claim accrues under the FTCA when a plaintiff is in possession of the critical facts that show he or she has been hurt, and by whom. *See Valdez ex rel Donely v. United States*, 518 F.3d 173, 180-181 (2nd Cir. 2008) (reversing the district court's dismissal of an FTCA claim and remanding for a determination of the claim's accrual date based on when the plaintiff had sufficient knowledge of the cause of injury); *Harrison v. United States*, 708 F.2d 1023, 1028 (5th Cir. 1983) (reversing dismissal of an FTCA claim where the defendant purposely suppressed medical records essential to the plaintiff's claim); *Eramo v. United States*, 92 F. Supp.2d 1290, 1294 (M.D. Fla. 2000) (FTCA claim did not accrue until the plaintiff obtained the relevant medical records); *Rice By and Through Rice v. United States*, 889 F. Supp. 1466, 1470 (N.D. Okla. 1995) (complaint survived motion to dismiss because it was unclear whether the plaintiff was "armed with the necessary facts to determine the cause" of the injury); *Hance v. United States*, 773 F. Supp. 551, 555-56 (W.D. N.Y. 1991) (FTCA claim accrued only when the plaintiff obtained information that would cause a reasonable person to suspect the government caused the injury); *Mendez by Martinez v. United States*, 655 F. Supp. 701, 706 (S.D. N.Y. 1987) (claim accrued only when the plaintiff was or should have been aware that government conduct caused the injury); *Lee v. United States*, 485 F. Supp. 883, 886-87 (E.D. N.Y. 1980) (declining to dismiss FTCA claim on statute of limitations grounds where defendant did not show that, more than two years before filing, the plaintiff knew or reasonably should have known that the government caused the injury).

Plaintiff also claims that "at no time prior to April 2010 did [she] ever know or even suspect the Government caused I.G.'s injuries." (Pl.'s Resp. at 10.) Because she was unaware that Erie maintained federal status, and that therefore the claim was governed by the FTCA, the discovery rule tolls her claim, Arteaga contends. (*Id.* at 11; July 6, 2011 Hrg. Tr. 3:15-23.)[3] The Seventh Circuit does not appear to have addressed the effect of a plaintiff's knowledge of the putative defendant's legal identity on the accrual or tolling of an FTCA claim. A number of other circuits have addressed this issue and while there appears to be a split, it is by no means an even one; the weight of the authority bolsters the government's assertion that knowledge of a defendant's federal status is unnecessary for a claim to accrue under the FTCA. (Def.'s Reply at 10-11.)

In *Gould v. U.S. Dept. of Health & Human Servs.*, another FTCA case, the Fourth Circuit stated that "[t]he burden is on the plaintiff to discover the employment status of the tort-feasor and to bring suit within the applicable limitations period." 905 F.2d 738, 745 (4th Cir. 1990) (citing *Dessi v. United States*, 489 F. Supp. 722, 725 (E.D. Va. 1980)). The government is "under no obligation to notify every prospective plaintiff of its identity and involvement through its employees in all potential legal actions." *Id.* (citing *Van Lieu v. United States*, 542 F. Supp. 862, 866 (N.D. N.Y. 1982)). The *Kubrick* Court, the Fourth Circuit noted, did not include the legal identity of the putative defendant as one of the critical facts a plaintiff must possess before an FTCA claim accrues. *Id.* at 743. Since *Gould*, several other circuits have come down on the same side as the Fourth Circuit. *See, e.g.*, *Hensley v. United States*, 531 F.3d 1052, 1056 (9th Cir. 2008) ("[A]s a general rule, ignorance of the involvement of government employees is irrelevant to accrual of a federal tort claim."); *Jones v. United States*, 294 Fed. Appx. 476, 480 (11th Cir. 2008) ("The 'knowledge of the government cause' requirement . . . does not require that a plaintiff know the defendant is a government employee for the cause of action to accrue."); *Norman v. United States*, 467 F.3d 773,

---

[3] The transcripts from this hearing are unedited and have not been entered into the record.

776 (D.C. Cir. 2006) (citing the Fourth Circuit's decision in *Gould* for the proposition that "plaintiffs have an affirmative duty to inquire as to the legal identity of the defendant."); *Skwira v. United States*, 344 F.3d 64, 77 (1st Cir. 2003) ("[I]n the medical malpractice context, where there is often a direct relationship between the patient and doctor, one need not know of a governmental causal connection for a claim to accrue under the FTCA."); *Garza v. U.S. Bureau of Prisons*, 284 F.3d 930, 935 (8th Cir. 2002) ("Where the government or its agents have not misled or deceived a plaintiff, or otherwise hidden the legal identity of alleged tortfeasors as federal employees, the [FTCA] cause of action still accrues when the existence of an injury and its case are known.").

Only the Third Circuit has tolled[4] the FTCA's statute of limitations to compensate for a plaintiff's lack of knowledge regarding the defendant's federal status and the facts in that case are readily distinguishable from Arteaga's case. *Santos ex rel. Beato v. United States*, 559 F.3d 189 (3d Cir. 2009). When six year-old Santos suffered permanent damage to her vertebrae after a hospital's misdiagnosis, *id.* at 194, her mother "diligently and vigorously pursued [a] claim" on her behalf. *Id.* at 198. The court described the conscientious efforts of Santos' mother:

> [S]he retained diligent counsel, who requested and reviewed her medical records, visited, corresponded with, and performed a public records search on [the hospital], and retained a family practice expert, a dental expert, a professor of pediatric otolaryngology, and a board-certified spinal surgeon, all of whom prepared expert reports.

*Id.* at 198. Santos' mother filed the claim two years and five months after it accrued, even though, under Pennsylvania state law, Santos had roughly eleven years–until she turned eighteen–to file a medical malpractice claim against a private hospital. *Id.* at 191, 194. These facts, combined with

---

[4] Notably, the Third Circuit permitted plaintiff's claim to proceed under the theory of equitable tolling, not the discovery rule; the court concluded that her claim indisputably accrued when, upon a return trip to the emergency room, the hospital properly diagnosed her infection. *Santos ex rel. Beato*, 559 F.3d at 194.

the lack of publicly available sources disclosing the hospital's federal status,[5] compelled the court to conclude that Santos has been prevented from asserting her rights in some extraordinary way, and thus her claim merited equitable tolling. *Id.* at 203.

While Arteaga does not explicitly argue that her claim should be equitably tolled, she does argue that injustice would result were her claim to accrue before she had the opportunity to learn that the proper defendant was the government and not, as she believed, a privately-run health

---

[5] This court notes that Erie's federal status is even less apparent than that of the hospital in *Santos ex rel. Beato*. In that case, the hospital's website disclosed that the hospital receives funding from, *inter alia*, the United States Department of Health and Human Services. *Id.* at 201. The site also described the hospital as a "federally-qualified health center." *Id.* Still, the Third Circuit held that this limited information "would not reveal to a reasonably diligent plaintiff that [the hospital's] doctors and clinics had been deemed federal employees . . . and thus were subject to the FTCA . . ." *Id.*

At the time of this opinion, Erie's web site remains even more cryptic regarding its federal status than that of the hospital in *Santos ex rel. Beato*. On the web page listing Erie's funders, there is no explicit statement that it receives federal monies or is otherwise affiliated with the federal government. *Partners and Funders*, ERIEFAMILYHEALTH.ORG, http://www.eriefamilyhealth.org/about-erie/partners (last visited Jan. 5, 2012). The page makes only passing reference to the fact that Erie is the founding partner of a health services alliance "comprised of four federally funded Chicago health centers." *Id.* The only express reference to its "federally-qualified health center" status is made in an archived news article that the court found only in a search for any reference to the word "federal": *Illinois Eye Institute to Transform Eye Care for Chicago's Neediest Residents*, ERIEFAMILYHEALTH.ORG, http://www.eriefamilyhealth.org/category/news-article (last visited Jan. 5, 2012).

The court is uncertain why Erie is not more forthcoming about its federal status. The Third Circuit acknowledged that the FTCA does not require medical facilities deemed federal entities to self-identify, but nevertheless concluded that defendants' failure to disclose, combined with plaintiffs' inability to uncover the hospital's federal status despite reasonable diligence, were sufficient to toll the statute of limitations. *Santos ex rel. Beato*, 559 F.3d at 202-3. *See also Valdez ex rel. Donely v. United States*, 518 F.3d 173, 183 (2nd Cir. 2008) (suggesting, in *dicta*, that equitable tolling of the statute of limitations may be available where a defendant medical facility fails to disclose that its physicians are federal employees).

The Third Circuit added that it found the frequent dismissal of FTCA claims on statute of limitations grounds particularly distressing where the plaintiff is a minor. *Id.* at 203-04. "[T]he Government is contending for a result likely to prejudice the weakest and most vulnerable members of our society who surely are compelled to rely on others for the assertion of their rights . . . There is no escape from the reality that the statute of limitations trap . . . is a perfect vehicle to ensnare children." *Id.* at 204. This court shares the concern expressed by the Third Circuit. Erie's failure prominently to disclose its status as an arm of the government is disappointing. As explained in text, the weight of authority holds plaintiffs responsible to timely uncover an FTCA defendant's status. Plaintiff here may, however, wish to seek further review of this determination.

clinic. (Pl.'s Resp. at 11-12.) Under Illinois law, a minor plaintiff has eight years from the date of the injury in which to file a claim for medical malpractice, 735 ILCS 5/13-212(b), and Arteaga filed her claim on behalf of I.G. well within that time frame. Because Erie does not make its federal status readily ascertainable, Arteaga contends that she had every reason to believe Erie was a private health clinic bound by Illinois' medical malpractice laws and that her claim was timely filed. (Pl.'s Resp. at 11-12.)

But unlike the plaintiff in *Santos ex rel. Beato*, Arteaga did not diligently pursue a claim on behalf of her child. She did contact an attorney within a year after I.G.'s injury, but once that attorney deemed I.G.'s claim untenable, Arteaga essentially abandoned the case for roughly four years, at which time she retained her current counsel. At no point in the interim did she obtain any other medical or legal opinion. Equitable tolling of a statute of limitations "is reserved for situations in which the claimant 'has made a good faith error . . . or has been prevented in some extraordinary way from filing his complaint in time." *Threadgill v. Moore U.S.A.*, 269 F.3d 848, 850 (7th Cir. 2001) (citing *Jones v. Madison Serv. Corp.*, 744 F.2d 1309, 1314 (7th Cir. 1984)). The court sympathizes with I.G.'s suffering, but cannot say that extraordinary circumstances prevented Arteaga from bringing a timely claim. On this record, the weight of the persuasive authority compels dismissal of this claim, unless and until the Seventh Circuit holds otherwise.

**CONCLUSION**

Because Plaintiff's claim accrued by July 2005—more than two years prior to the filing of her administrative claim on May 11, 2010–this action is barred by the FTCA statute of limitations. The court grants Defendant's 12(b)(6) motion to dismiss [16].

ENTER:

Dated: January 6, 2012

REBECCA R. PALLMEYER
United States District Judge